May it please the Court, Your Honors. My name is Paul Mollica and I'm representing Linda Reed, the plaintiff in this case. The District Court succinctly described the stakes of the merits of the litigation when she said, in reference to Tennessee v. Lane, what good would come from ensuring that disabled individuals have physical access to a courtroom without also ensuring that they can participate effectively? And for 90% of the opinion when we read it, we were very happy with the results because the judge recognized that there were no immunity or other issues, there was no Rooker-Feldman issue, but we were unhappy with the 10% of the decision where Judge St. Eve decided that there was collateral estoppel effect because Linda Reed had requested that a state court judge give her accommodations and twice the judge entered, presumably orally and then in writing, orders that she had enough accommodations, she didn't need anything more. What she had asked for, in addition to rest time and a podium and somebody to help her keep notes during the proceedings, a microphone, like the one I'm using right now, and also having a proxy, somebody who could speak for her when she was unable to speak due to her neurological and mental disabilities. So the question is whether those orders by the state court judge should have collateral estoppel effect. And we had argued to the judge both that there was no identity of issues because the issue of appropriate accommodations during a trial raised different issues in the context of a new trial motion where the question was whether in the overall scheme of the trial, whether she was denied a fair trial. And under the ADA and Rehabilitation Act, where the issue is whether if Ms. Reed demonstrated that it was a reasonable accommodation, whether it was an undue burden on the court to provide those accommodations. And so there was no identity of issues. We also presented the argument in the alternative that it would be unjust to apply the state law defense of equitable estoppel. In our original argument, we argued that it was circular, that it gave the state court judge essentially the final word on whether the accommodations abided by federal law. And then we elaborated on that in our 59E motion to also explain that based on the way the judge wrote the order, it would be very difficult for any claimant to raise a claim in federal court that their rights were violated under the ADA and Rehabilitation Act if a state court judge could say, well, I did everything right. What's unfair about that? Because it means that she has no recourse to a federal remedy under the ADA or Rehabilitation Act. That's a statement of what the consequences are. What's unfair about that? If a pro se litigant in state court invokes the ADA in passing to say, I have rights, she had no realistic opportunity to develop in state court why denying her a microphone, denying her a proxy to speak for her, would violate the specifics of federal law. Why was there no opportunity? I thought there was an opportunity. In fact, this was fully litigated as an issue. It wasn't litigated as an ADA claim, but the issue was litigated, the accommodation in all its forms. State courts are not unfair fora. State courts are on par with federal courts for litigating these claims. There's nothing unfair about what occurred here specifically. There's certainly nothing unfair as a general matter. I understand your argument to be sort of a general argument that it's unfair because it's a catch-22. Yes, Your Honor, that's absolutely correct. It is a catch-22. But why is it unfair to have state courts adjudicate these accommodation claims? State judges are just as good at doing that as federal judges. If Linda Reed had had the opportunity as a pro se litigant to present this to Judge Jones as a reasonable accommodation claim, meaning that the burden shifted to the judge at that point to demonstrate why there was an undue burden to provide a microphone and a proxy, that would approach closer to what you're describing. But that opportunity, sincerely, especially considering the pro se status of the litigant in this case, really didn't exist. Why did it not exist? She was on notice that she had general rights under federal law. She was not apprised of how effective communications works under the ADA and the Rehabilitation Act. The court doesn't have an obligation to give her a primer in ADA law. The court just has an obligation to consider the accommodation issue, and we accord collateral estoppel effect if the judge did that, which the judge did here. You're right that he considered whether the accommodations should have been provided, what he decided. But he specifically considered whether they were reasonable, right? Well, in the order that we have, he said that I gave you essentially enough accommodations. I gave you rests. I gave you a podium. I let somebody write notes. We don't have insight about why she was denied a microphone, why she was denied a proxy to speak for her when she couldn't talk for herself. Is it correct that there's no transcript of the state proceedings? That's right, Your Honor. Ms. Ree did not order a transcript. When she took her appeal, she took it of issues where she didn't need the transcript. Was there any medical evidence about her condition? I don't believe any was presented at trial, no, Your Honor. And she didn't raise this reasonable accommodation argument in her direct appeal, right? All she did was mention the federal law. And as Judge St. Eve said, that essentially preserved the opportunity for the appellate court to rule on it. But she did not raise it as a direct issue on appeal. You're right. I'd like to reserve the remaining time for rebuttal. Thank you, Your Honors. Thank you, Mr. Mullen. Ms. Welsh? Good morning, Your Honors. May it please the Court, I'm Mary Welsh. I'm here on behalf of the defendants' appellees. The question here is quite narrow, and it's whether the plaintiff has collaterally stopped with raising the reasonable accommodation issue in the federal court. And the answer is yes, because she's already litigated it in the state court. The plaintiff's post-judgment motion makes a very specific argument about the Americans with Disabilities Act. She has it at pages 15 and 16. She says the Americans with Disabilities Act. She says that she was denied reasonable accommodation. Why wasn't there a transcript of the state proceeding? I'm actually not sure there wasn't a transcript taken. I don't know that the state court defendant didn't have a court reporter. Apparently, Ms. Reed decided not to pay for the transcript, but I don't know that there wasn't the opportunity to have a transcript. My understanding is in the state court municipal division that you have to bring your own court reporter. And I have read things that lead me to believe that the state court defendants had a court reporter, but I don't know that for a fact. But what's important here is that... Was it helpful to look at the transcript to see how severe her disability is or how effective the accommodation was to enable her to articulate her case? Well, certainly on direct appeal, if she had wanted to pursue the ADA reasonable accommodation issue, she would have had to supply a transcript so that it could verify or not her argument that she wasn't able to make a comprehensible... What do you mean supply a transcript? You mean she has to pay for a transcript? Yes, every appellant has to pay for their own transcript. I mean, unless it's been filed by the... What does it cost? I don't know. I think... I don't know. I don't know. Maybe a dollar a page. I'm not sure. It's probably similar to what the federal transcripts cost. And also, if she were indigent, she could ask... We have litigants that you can ask the court to weigh the transcript cost. You can get the court to provide a transcript. She never made that request. No, I don't believe she filed IFP, so I don't know that she... in her state court case. I mean, she didn't hear as far as I know. So the question that the court has focused on so far is fairness, and certainly plaintiff had both an opportunity and an incentive to litigate the ADA issue, reasonable accommodation issue, and she took that opportunity. She raised it in her post-judgment motion very specifically, and the judge in the post-trial order addressed it very specifically. In fact, the judge says, And remember, her post-trial motion said that she had a speech impediment, that that was her disability. Her impediment concern was accommodated, and that she was thus fully afforded a fair and adequate opportunity to present her case, which she accomplished at a level that far exceeded that of most pro se litigants in jury trials in spite of her condition. That's at 61-2 at page 6. So the circuit court addressed quite specifically the issue of whether she had had a reasonable and meaningful opportunity to be heard, and that is the crux under Lane of the access to the courts question for litigants with disabilities. In Lane, the court said what happens here, what the ADA is designed to do is to provide a meaningful opportunity to be heard by lifting the obstacles that prevent participation in the court in a judicial proceedings. And here, certainly, plaintiff participated fully in the state court proceedings. The judge acknowledged this. The judge says in several ways that she participated fully despite her impediment, her disability. So then your position would be that if she felt that the district court was wrong, she should have made that direct appeal in the state court system, and that would be it? Absolutely. That's what she should have done. By abandoning it on direct appeal, she lost her opportunity to pursue this issue, to litigate it to the end. She could have, in fact, gone to the Supreme Court. It is not irrationally exuberant to suggest that plaintiff could have gone to the Supreme Court with a cert petition saying, I was denied a meaningful opportunity to be heard in the state court because I was not accommodated. My disability was not reasonably accommodated. She could have done that. She didn't. Since, let's say, she went all the way up to the state Supreme Court, doesn't get relief, could she then come to federal court saying there was some kind of violation and not run into the same problem? Right. She would run into the same problem. What she had to do, what you do in that case is you do what the Lane plaintiff did, the Tennessee versus Lane plaintiff. You go to federal court. You don't exhaust, as it were, you don't set up your preclusion problem in the state court. You go to federal court either during or after the proceedings, but you don't make it an issue in your state court proceedings because that's what leads to preclusion. It could have led to Rooker-Feldman if the proceedings had been finished, but when we moved to dismiss, but the proceedings were still ongoing, so Rooker-Feldman didn't apply. Do you accept the description in the plaintiff's opening brief of her condition? For the purposes of summary judgment, yes, or 12b-6. For the purposes of 12b-6, yes, of course. Well, she says she was granted some of her requests, a note-taker, a podium, and occasional recesses. Correct. But without explanation, she was denied a microphone, an interpreter to speak on her behalf, and a jury charge explaining the nature of her disability. I don't understand that. Which do you not understand? I don't understand why the judge didn't hear those things. Because he believed that they weren't necessary. Well, I should think the jury charge would be extremely necessary. I believe, actually, he did discuss this with the jury, and he, in fact, said in his post-trial motion that he thought that the jury liked her and that its decision was not at all affected by her disability. So then he specifically told the jury that, what her disability was, because that's what she's saying was missing. The jury didn't understand the nature of her disability. I don't think there was a charge to the jury. That's what I'm interpreting. Right. Or like a jury instruction? An acknowledgment. Yeah, at the beginning of the trial, in the preliminary instructions, explaining that she has this condition, that they shouldn't hold that against her in any way, that because of her condition there might be longer recesses or whatever. None of that was done. Well, I think, and the reason it wasn't, as the trial court judge said, at all times she at all times presented as being fully mentally capable and alert, physically able except for the speech condition. It was necessary to take several steps to accommodate that disability, and then he describes those. So to him, these were the reasons that it was. What I'm saying, did he articulate that to the jury? She also states in the brief that the judge became impatient with her. Right, and the judge addressed that in the post-trial motion. He says, there were occasions when her pauses were so lengthy that the court concluded she was being indecisive rather than. How on earth could the judge, really? How could the judge distinguish between what she was doing because of this list of rather horrible illnesses in the brief, which you say you accept, between that and some kind of strategic concealment? Well, certainly judges make these sorts of decisions every day, whether witnesses are stalling or difficult. If you're dealing with a person with all the ailments that are listed here, diseases I've never heard of, if the judge has questions about it, why doesn't he appoint a medical expert to advise him on the nature of her condition? Well, if I can finish what the judge said about this very issue, which she brought up in her post-trial motion, that she was being indecisive rather than laboring under the impediment, and she was asked to move on, as would any other individual. But she's not any other individual. Well, Your Honor, if I may continue, at those times she appeared able to fully respond and proceed in a most functional manner. So the trial judge observed her, was it first person observing? That is so naive to think that a judge or any lay person can diagnose the condition of a person with these horrible ailments. The trial judge had had conversations and dealings with the plaintiff for over quite a long time. I think he was in the perfect position to understand the extent... So I say, yes, he perfectly understood her ailment. Tardive, dyskinesia, tongue-thrusting, choking, side-to-side chewing, involuntary movements through her body constantly, becomes mute, screams, or makes non-verbal sounds. Ah, sounds terrible. Well, again, Your Honor, the trial court judge found that she accomplished her trial proceeding at a level that far exceeded that of most pro se litigants in jury trials. And here she also says she suffered these embarrassments in front of the jury. This is what a piece of gum she chewed fell out of her mouth. He scolded her before the jury. She entered a convulsive state in the sight of the jury, causing disruption and humiliation. Her nose was running, which was a side effect of the drug. She didn't have a tissue. But I want to focus on, I understand he looked at the jury and thought the jury was sympathetic. Correct. From observing. Correct. But he never said to the jury, you should not, you know, here's her situation. In reaching a verdict in this case, you should not consider her behavior. She has certain medical challenges. I don't have all the language that I would personally give. And that you can't hold that against her in any way. And that any delays that we have, or any of her mannerisms that you see, are a result of her medical condition, and so you shouldn't hold it against her. That was never said. No, Your Honor. In fact, in the post-judgment, post-trial order, the judge says, the prosecutive jurors were asked whether the plaintiff's impediment would prevent them from giving the parties a fair trial, and the sworn jury was reminded several times not to hold her condition against her or the defendants. And what kind of explanation did he give of her condition? I don't, I'm not sure what the extent of it was, but certainly the issue was addressed several times. You see, the problem is, her symptoms could be symptoms of just an angry, disruptive person, or they can be the result of a disease, or they could be both. And if the judge thought that she had some genuine symptoms, but that she was also uncooperative and so on, then he should have had a medical expert advise him, you know, is this all her disease, or is she exaggerating, or what? Well, first, Your Honor. Otherwise, he doesn't have the capacity to make those distinctions. Well, first, Your Honor, plaintiff didn't ask for that. And second, Your Honor, the trial judge, certainly trial judges are, I think we know this generally, the trial judges are given the task of making these decisions. No, they're not given the task of psychological or physical diagnosis. Your Honor, if she had, again, she didn't ask for that accommodation. And I think that to have a standby... By himself, I have a person who may be sick, or may be some kind of malinger or something, or may be a mixture of them. I have to find out what this person's condition is, and I have to explain this to the jury. Your Honor, I don't think that's the way the ADA works. I think the ADA works is that the person with a disability... Oh, this is wonderfully absurd, isn't it? What you're saying is a person who is disabled has to be able to articulate her disability? What are you talking about? Your Honor, that's what the disability coordinator... So if the person was mute or something, you'd say, well, she didn't ask for an accommodation because she can't speak. Therefore, she doesn't get it. That's what you're saying. I don't know that that's what I'm saying, Your Honor. I think that's what you're saying. I don't believe it is. But if I may, I see my time is almost up. I just have a quick question. So she didn't ask for IFP status, nor did she ask for counsel? I'm sorry? Did she ask for counsel to be appointed? In the state court case? Yes. I believe she did, actually. And that was rejected by the court? Yes, certainly. And the reason for that? I don't know that the reason is on the record. My guess would be that it would not be a reasonable accommodation, that it would change the function of the court to start supplying counsel to people with disabilities. So there's no such process in the state court where the court can appoint someone in a civil case where someone has at least alleged that they have a disability? Certainly, the possibility is – But I haven't been in the circuit court of Cook County, so I don't know. So that's why I'm curious. Isn't there a process whereby a state court judge can appoint someone to represent a plaintiff in a case like this? This I don't know, Your Honor. Certainly, litigants have no due process right to have counsel in a civil case. And the ADA is really the equivalent with regard to a disability. So it would seem to me that if you don't have a 14th Amendment right generally to have counsel appointed for you in a civil case, because it's not a due process requirement, then I think that you wouldn't have it in an ADA case because the ADA gives you the 14th Amendment access to the courts, removing barriers because of your disability. So I would guess not. The reason I'm asking is that district judges here routinely appoint counsel for pro se litigants for a variety of reasons. There's a statute for that, Your Honor. And that's why I'm trying to find out what goes on in the circuit court. Right. And it's also what's available. That's what I'm trying to get at. Right. I think that's, I mean, for IFP status that's true, but if there's recruited counsel in district court, in federal court, I don't know that that's true in state court. I just don't know. Again, just to close, the plaintiff actually fully litigated the issue of reasonable accommodation in the state court. And because she did, she has collaterally stopped here. And it's not unfair to apply collateral estoppel here because she had this opportunity and then abandoned it on direct appeal. She also could have gone to district court and not raised the issue at all in her post-judgment motion, and yet she did. And that is why collateral estoppel is, in fact, applicable here. Thank you. Okay. Well, thank you, Ms. Welsh. Mr. Malika? Thank you, Your Honors. Judge Williams, I'm not sure what the history was about appointing counsel, but the record is that Ms. Reed, her health deteriorated right before trial. So the circumstances for the years while the case was pending was quite different. The only thing I want to add is that as I heard Ms. Welsh describing this, my client's best alternative to getting federal relief would have been to just skip over the interactive process part of the ADA and the Rehabilitation Act and leap into court to get an injunction or some kind of relief. But this court, and every court of appeals, more or less insists that disabled claimants first try to work out their problems with the institution or the employer before they invoke federal jurisdiction. And what happened here is she, in good faith, worked both with the disabled coordinator, Ms. Bryce, and also tried to work with the judge. And what we're hearing today is by invoking the ADA interactive process with the judge, she collaterally stopped herself from ever getting federal relief. That's not only unfair, it defies the whole ADA and Rehabilitation Act process. No, it just means the state courts decide the issue. There's nothing unfair about state courts adjudicating ADA accommodation claims. It would mean that it would be very difficult for a claimant to try to work things out with a state court judge in these cases. It can be reviewed on appeal to the Intermediate Court of Appeals and the Illinois Supreme Court and potentially the U.S. Supreme Court as well. It's just if you come into federal court on the same claim, you're going to be collaterally stopped. Federal district court. You're right, Your Honor. And then the answer would be that after this decision came down, that every claimant in state court would simply just jump over here. They wouldn't bother asking the judge or the disability coordinator to help them because why should they? They'll be collaterally stopped. They won't have a claim in federal court because they have to make the request for the accommodation. And that's why you've created the dilemma. It would be a problem if we trust state courts to adjudicate these claims fairly and for a federal court to say that we don't trust state courts to accommodate or decide accommodation claims fairly. That would be a pretty extraordinary statement from a federal court. All I'd have to say, Your Honor, is based on the allegations of the complaint, this judge was singularly unable to handle the accommodation. And I don't think that he earned the trust of this court under these circumstances, Your Honor. So let me ask you this. So you're saying that once she got the verdict, then she should have come over here to federal court and not asked him for any relief in the pre-trial post-trial motions? Based on what I'm hearing from the Attorney General, that's right. She should have come over here and gotten an injunction. But that's a preposterous reading of the federal statute. So let me ask you this in terms of the accommodation. She tries to work it out initially pre-trial, right? Right, Your Honor. Okay. And then she tries to work it out during the trial. Yes, Your Honor. Not to her satisfaction. She gets the verdict. She comes over here. I will say this, Your Honor. I don't know what the record is during trial. I know the pre- and post-trial proceedings. And she didn't make any requests for counsel when her medical condition changed when she deteriorated. I don't know the answer to that question, Your Honor. And I don't know what the procedure would have been. Okay. Thank you, Your Honors. Thank you very much, Mr. Mollica and Ms. Welsh.